MISSISSIPPI STATE HIGHWAY COMMISSION *v.*
MERIDIAN BRICK CO., et al.

No. 42488          December 17, 1962          147 So. 2d 302

*Dunn & Singley,* Meridian, for appellant.

*Ethridge, Minniece & Bourdeaux,* Meridian, for appellee.

LEE, P. J.

This was an eminent domain proceeding in the County Court of Lauderdale County by the Mississippi State Highway Commission to take, for highway purposes, certain lands of Meridian Brick Company, a corporation in the City of Meridian, as described in the petition.

The brick company, an old established brick manufacturer, held a lease on 15.22 acres of sixteenth section land, with the expiration date on February 28, 1981. On this site was located the manufacturing plant, with dry kilns, stacks for drafting, drying sheds, the mixing building with the attendant ramp alongside for the dumping of clay therein, the clay pit area and stockpile,

a brick office building, a car and truck sheds, and tool and tenant houses. It was equipped with power machinery and rolling stock with which to convey the clay to the mixing machinery.

A cloverleaf is to be constructed for ingress to, and egress from, two interstate highways, three U. S. highways, and two state highways, which intersect in this area. The Commission seeks to condemn 2.73 acres off the northwesterly corner and 2.55 acres off the northeasterly corner of this tract, which parcels are not adjacent, for use in the construction of one of the legs of the proposed cloverleaf. Actually the storage of the clay stockpile, the driveway from it to the ramp, and the turnaround for dump trucks getting clay from the stockpile and for backing up the ramp to dump clay into the mixing machines are all on the 2.55 acre portion. Clay, in the amount of 5,000 cubic yards, was stored in the stockpile. The company also owned 6.9 acres, in fee, about a quarter of a mile from the plant, which it has been using as a clay pit area. The Commission will take 4.07 acres out of the middle of that parcel. The highway to be built through all of the land will be of limited access.

Two licensed real estate agents, of the City of Meridian, S. A. Rosenbaum and R. M. Eatman of sixteen and twelve years of experience, respectively, testified that they were familiar with the lands and property in question. Rosenbaum gave the fair market value of the large tract, before the taking, as $141,488.75; and after the taking, $115,448.75; with resulting damage of $26,040.00. On the smaller tract, it was his opinion that such value, before the taking was $6,440.00, and after the taking, $2,120.00, with the damage on that parcel of $4,320.00. In his opinion, the total damage would be $30,360.00. Eatman placed the fair market value of the large parcel, before the taking, at $147,267.00; and such value, after the taking, at $117,260.00; with a consequent

damage of $30,007.00. The before value of the smaller parcel, he placed at $3,900.00 and the after value at $1,188.00, or damage of $2,712.00. His estimate for the whole amount of damage was $32,719.00. He admitted that he did not know anything about the operation of a brick yard. He said that one of the elements was a thirty to thirty-five per cent reduction of the acreage. He did not think that the remainder of the land would be decreased in value. Besides, the improvements were not being taken. Neither did he allow for the taking of any clay.

Frank McDonald, who had been tax assessor of the county for sixteen years and had twenty-five years experience in the real estate business, was familiar with this property. He estimated the value of the lands and improvements of the large parcel, before the taking at $258,350.00; and, after the taking, at $116,350.00; with damage thereto of $142,000.00. Such value of the smaller tract, before the taking, was $6,320.00, and after the taking, $1,120.00, or damage of $5,200.00. His estimate made a total damage of $147,200.00.

Harold Parker, president of the company and owner of all of the stock, had been working regularly for the company since 1932. He gave an extended description of the area and plant; and how the materials are delivered for processing. In his opinion, the fair market value of the land and improvements on the large parcel, before the taking was $290,000.00; and after, $70,000.00; with a damage thereto of $220,000.00. The small parcel he valued at $3,000.00 per acre or $18,000.00, and after the taking, he said that it would be worth only $500.00, thus resulting in a damage of $17,500.00. He said that clay, in the amount of 5,000 cubic yards, is stored on the stockpile area. In the small parcel, an acre or two has been used as a clay pit, and a portion of it is still usable as such. On cross-examination, he said that the ramp cannot be used after the taking because the

right of way just misses it. One building will be torn down and the other buildings will be useless in their present situation because they are a part of the plant which consists of one unit. The stockpile is the material out of which the machine makes brick.

██ ██ George Cermak, who was secretary-treasurer of the company for thirteen years and owned one-half of the stock until 1958, was of the opinion that the present fair market value of this property was in excess of $300,-000.00; that after the taking, it would be worth only $58,000.00; that the present market value of the small parcel was $6,000.00 and that after the taking it would be worth only about $1,500.00. On cross-examination, he said that he valued the property as it was before anything was removed. After the construction, it will have no value other than the land and the salvage value. The brick plant will have to be rebuilt. The ramp cannot be used. Besides two kilns will be unusuable because the highway will be so close as to prevent storage. The remaining space will not be sufficient to permit the manufacture of brick.

Earl E. Schneider, who has been in the brick manufacturing business at Laurel for twenty years, said that he was generally familiar with the fair market value of brick manufacturing plants in that area. He had carefully viewed this plant. In his opinion, the fair market value, before the taking was $250,000.00. After the taking it would be worth only $95,000.00. The result would be damage in the sum of $155,000.00. On cross-examination he said that the plant will have to be rearranged. It will be crowded out as a place to manufacture brick. There will not be enough room to operate. It takes the area where the clay is incorporated in the soil. Another one of these is absolutely necessary. But there is no other place to go. It cannot be operated as it was then being operated.

Fred Mitchell, who has been in the brick manufacturing business in Louisville for thirty-five years, knew where the stakes had been set for the taking of this property. He was familiar with the value of such plants. Taking into consideration the land and improvements, in his opinion the present fair market value was $240,000.00. After the taking the property would be worth not over $100,000.00. The total damage, according to his estimate, would be $140,000.00. On cross-examination, he stated that he owns no land in Lauderdale County and does not know the value of land as such in the county. But he said that he knows the value of the property as a brick mill. He knew nothing about the profits being made in this business. He said that the improvements and the land make up the value and called attention to the fact that one-third of the area is being taken. The clay storage is the food of the mill — you might as well take the mill as to take that. There must be a suitable place to store the clay. The other open area near the mill is not large enough. To prepare such an area, it would be necessary to excavate eighteen inches to two feet deep and refill the same with clean dirt and pack it again.

There was a view by the jury, and the record discloses that this view was detailed and elaborate. From a reading of the record, it is not seen how anything of consequence could have escaped the attention of the jurors. There was a verdict for $65,000.00. On appeal, the circuit court affirmed the verdict of the county court; and the Commission has appealed to this Court.

The appellant's complaint as to the competency of the witnesses Cermak, Schneider and Mitchell, is two-fold. It says that (1) none of these witnesses pretended to know the value of the land, as such, in Lauderdale County, and that, therefore, they were not qualified to testify, and (2) that they were taking into consideration

that the profits of the business would be curtailed and that there would be serious damage on that account.

It is true that these witnesses had neither bought nor sold real estate in Lauderdale County, but they showed beyond question that they were thoroughly familiar with the brick business and what such a plant should be worth.

In Board of Levee Commissioners of Yazoo-Mississippi Delta v. Lee, 85 Miss. 508, 37 So. 747, the landowner, the operator of a steamboat landing, who owned three or four acres of land which were not taken, was permitted, over objection, to show by two witnesses, who were experts on that subject, that the strip of land taken had a special value because of such use. The opinion on appeal here held that such evidence was competent.

In Mississippi State Highway Commission v. Strong, 240 Miss. 756, 129 So. 2d 349, where the appellant complained because of the introduction by the appellee of a realtor from another section of the state, the opinion said that this was not error. 18 Am. Jur., Eminent Domain, Sec. 355, p. 1000 was cited. That authority prescribes that the so-called expert witness, to whom the opinion referred, must be shown to have ''some peculiar means of forming an intelligent, correct judgment as to the value of the property in question or the effect upon it by a particular improvement, beyond what is possessed by men generally.''

In the case of Board of Levee Commissioners v. Dillard, 76 Miss. 641, 25 So. 292, it was held that Stovall's evidence was properly excluded because he was not even acquainted with the plantation owned by the appellee. Also, in the case of State Highway Commission v. Rogers, 240 Miss. 529, 128 So. 2d 353, the testimony of the witness Warren was improper because that witness was not familiar with the property involved in that case at the time it was taken. He did not inspect it until after

the taking and the attendant changes had been made. These cases, cited by appellant, are not in point here.

On the larger parcel, the brick manufacturing plant, together with its adjuncts, was situated. These men, with their long experience in that kind of business, of all witnesses, had the "peculiar means of forming an intelligent, correct judgment as to the value of the property in question or the effect upon it by a particular improvement, beyond what is possessed by men generally." Their evidence in this regard was clearly competent and admissible.

■■■ On the second proposition, the appellant seizes upon certain replies on cross-examination like "it is not operable as a brick yard", to which objection was sustained; "there will be no value left other than the value of the land and the salvage value"; "he cannot operate it as he does today"; and "the worth, $240,000.-00, that you included the business of the brick company? That's right." But at another point in the cross-examination, when the attorney endeavored to involve the witness in the question of profits, the reply was, "I don't know about the Meridian Brick Company's profits."

The whole onus of the evidence of these witnesses was this: They gave their respective estimates as to the value of the parcel of land with the brick manufacturing plant and all its adjuncts as then constituted and forming one complete unit. Because of the taking of the storage pile, and the closeness to the ramp, it would nullify the use of the mixing plant as then constituted. Several kilns would be rendered unfit for further use; and, because of the other matters which they detailed, it would be impossible to operate that plant as it is operated at the present time. They were of the opinion that the whole layout would have to be rearranged and rebuilt and that another storage pit would have to be provided by excavation, etc. In other words, the piece of property will be seriously damaged by this taking.

The appellant places considerable reliance on Mississippi State Highway Commission v. McCardle, et al., 243 Miss. 111, 137 So. 2d 793. But in that case, the inquiry was about profits, what would happen to the stock farm, and the landowner said that he would have to sell his cattle and quit raising calves. The opinion cited cases to show that evidence as to the destruction of or loss to, business carried on upon the property is inadmissible. The opinion also called attention to one of the cases cited, namely, City of St. Louis v. St. Louis, etc., Railway Co., 182 S. W. 750, wherein there was cited the following rule from Lewis on Eminent Domain, to-wit: "While it is proper to show how the property is used, it is incompetent to go into the profits of the business carried on upon the property. No damages can be allowed for injury to business." The opinion said: "The fundamental reason for the exclusion of evidence of profits lies in the rule of substantive law that the condemnor takes only the real property, not the business located thereon." The same question was before the court in Mississippi State Highway Commission v. Ladner, 243 Miss. 139, 137 So. 2d 791.

But the evidence in the present case does not bring it within the rule which has been set out in the McCardle and Ladner cases. There was no effort whatever to show profits in the present case. The inquiry was concerning damage to the property which will result from this taking; and, if it is to be believed, the whole plant will have to be rearranged.

The appellant also contends that the verdict is excessive. The verdict is for a substantial sum; but the jury was well warranted in believing that much damage will be done to this property. They heard the conflicting opinions of the witnesses. They also viewed the whole operation, and, from the amount of the verdict, it is clear that their judgment was influenced in great measure by what they observed through their physical senses.

There is not sufficient justification on which the amount can be reduced.

The other assignments do not require a response.

Consequently the judgment of the circuit court is affirmed.

Affirmed.

*McGehee, C. J., and Kyle, Ethridge and Rodgers, JJ.,* concur.